


LEGAL SEARCH CONSULTANTS

# PARTNER COMPENSATION SURVEY 2012

JEFFREY A. LOWE, ESQ.
Global Practice Leader - Law Firm Practice
Managing Partner - Washington, D.C.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




# TABLE OF CONTENTS


Background ........ 4

The Survey ........ 4

Methodology ........ 5

Statistical Terms Used ........ 6

Compensation, Originations, Receipts, Billing Rates and Hours ........ 6

Compensation ........ 7

Exhibit 1.1 – Average Total Compensation by Partnership Tenure ........ 8

Exhibit 1.2 – Average Total Compensation by Partnership Status ........ 8

Exhibit 1.3 – Average Total Compensation by Practice Area ........ 9

Exhibit 1.4 – Average Total Compensation by City ........ 10

Exhibit 1.5 – Average Total Compensation by Compensation Transparency ........ 10

Exhibit 1.6 – Average Total Compensation by Lockstep Type ........ 11

Exhibit 1.7 – Average Total Compensation by Firm Size ........ 11

Exhibit 1.8 – Average Total Compensation by Firm PPP ........ 12

Originations ........ 13

Exhibit 2.1 – Average Originations by Partnership Tenure ........ 13

Exhibit 2.2 – Average Originations by Partnership Status ........ 13

Exhibit 2.3 – Average Originations by Practice Area ........ 14

Exhibit 2.4 – Average Originations by City ........ 14

Exhibit 2.5 – Average Originations by Compensation Transparency ........ 15

Exhibit 2.6 – Average Originations by Firm Size ........ 16

Working Attorney Receipts ........ 16

Billing Rates, Billable Hours and Non-Billable Hours ........ 17

Exhibit 3.1 – Average Billing Rate by Firm Size ........ 18

Exhibit 3.2 – Average Billable Hours by Firm Size ........ 18

Exhibit 3.3 – Average Non-Billable Hours by Firm Size ........ 18

Compensation Satisfaction, Factors and Systems ........ 20

Satisfaction Ratings ........ 20

Exhibit 4.1 – Overall Satisfaction with Total Compensation ........ 20

Exhibit 4.2 – Satisfaction by Partnership Tenure ........ 21

Exhibit 4.3 – Satisfaction by Partnership Status ........ 21


EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




Exhibit 4.4 – Satisfaction by Practice Area ..... 22
Exhibit 4.5a – Satisfaction by City (1) ..... 23
Exhibit 4.5b – Satisfaction by City (2) ..... 23
Exhibit 4.6 – Satisfaction by Compensation Transparency ..... 24
Exhibit 4.7 – Satisfaction by Lockstep Type ..... 24
Exhibit 4.8 – Satisfaction by Total Compensation ..... 24
Exhibit 4.9 – Satisfaction by Total Originations ..... 25
Exhibit 4.10 – Satisfaction by Billable Hours ..... 25
Exhibit 4.11– Satisfaction by Firm PPP ..... 26
Exhibit 4.12 – Satisfaction by Gender ..... 26
Compensation Satisfaction and Perceived Bias ..... 27
Desire for Higher Compensation ..... 28
Exhibit 5.1 – Satisfaction with Compensation Level ..... 28
Exhibit 5.2 – Level of Compensation Desired (Percentage Increase) ..... 28
Importance of Factors in Determining Compensation ..... 29
Perceived Importance of Factors ..... 29
Exhibit 6.1 – Importance of Factors Determining Compensation ..... 29
Exhibit 6.2 – Perceived Importance of Factors Determining Compensation ..... 30
Exhibit 6.3 – Change in Importance of Factors Determining Compensation ..... 31
Respondent Profile ..... 32
Partnership Tenure ..... 32
Exhibit 7.1 – Respondents by Partnership Tenure ..... 32
Partnership Status ..... 32
Practice Area ..... 32
Exhibit 7.2 – Respondents by Practice Area ..... 33
City ..... 33
Exhibit 7.3 – Respondents by City ..... 33
Lateral Status ..... 33
Compensation Transparency ..... 34
Lockstep Type ..... 34
Total Compensation ..... 34
Exhibit 7.4 – Respondents by Total Compensation ..... 34
Firm Size ..... 34

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




Exhibit 7.5 – Respondents by Firm Size ..... 35
Exhibit 7.6 – Respondents by Firm PPP ..... 35
Gender ..... 35
Ethnicity ..... 36
Exhibit 7.7 – Respondents by Ethnicity ..... 36
Notes ..... 36
Appendix I—Respondent Profile ..... 38
Appendix II—Average Total Compensation ..... 47
Appendix III—Compensation Change for Lateral Partners ..... 53
Appendix IV—Average Total Originations ..... 56
Appendix V—Average Total Working Attorney Receipts ..... 62
Appendix VI—Average Billing Rates ..... 68
Appendix VII—Average Billable Hours ..... 74
Appendix VIII—Average Non-Billable Hours ..... 80
Appendix IX—Satisfaction with Total Compensation ..... 86
Appendix X—Desired Compensation ..... 100
Appendix XI—Importance of Factors in Determining Compensation / Desire for Changes ..... 102
Appendix XII — Questionnaire ..... 109

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

## BACKGROUND

In the spring of 2012, Major, Lindsey & Africa (MLA) launched its second Partner Compensation Survey. The Survey, which was sent to more than 74,000 law firm partners in Am Law 200-, NLJ 350- and Global 100-size firms across the United States, was a follow-up to MLA's ground-breaking 2010 Survey, which was the most comprehensive effort ever undertaken to identify ranges of partner compensation, the criteria law firms use in determining partner compensation, and the satisfaction of law firm partners with their compensation and compensation systems.

This Report provides (i) an overview of the Survey, (ii) the demographic breakdown of the respondents to the Survey, (iii) selected highlights of compensation and other practice metrics as reported by the respondents, (iv) selected highlights of compensation satisfaction, factors and systems as reported by the respondents, and (v) an overview of various factors perceived by respondents to be important in the determination of their compensation.

## THE SURVEY

The Survey consisted of 32 questions, with the results broken down into three major categories:

1. Demographic information about each respondent and the respondent's law firm, including:

    - Law school graduation year
    - Years as a partner
    - Partnership status (*i.e.*, Equity vs. Non-Equity)
    - Primary practice area
    - City
    - Lateral status (*i.e.*, "home grown" vs. lateral)
    - Compensation transparency of firm (*i.e.*, open vs. closed compensation system)
    - Lockstep nature of firm's compensation system (*i.e.*, lockstep vs. non-lockstep)
    - Size of law firm
    - Law firm Profits per Partner as reported in *The American Lawyer*
    - Gender
    - Ethnicity

2. Objective information about a respondent's compensation and practice metrics for 2011. Compensation and practice metrics include:

    - Total compensation
    - Total originations
    - Total working attorney receipts
    - Standard hourly billing rate
    - Total billable hours
    - Total non-billable hours
    - For lateral respondents, whether their compensation changed as a result of the lateral move and, if so, by what percent

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




3. Subjective information about a respondent's perception of his or her compensation and compensation system, including:

- Factors perceived by respondent to be important to the firm in determining compensation
- Factor which respondent believes should be most important in determining compensation
- Whether there has been a change in the importance of factors and, if so, which factors have become more important or less important
- Satisfaction with total compensation
- For those respondents who were not satisfied with their compensation, whether such dissatisfaction was attributable to any perceived bias
- Whether respondent believed his or her compensation should be higher and, if so, by what percent
- Whether respondent would like to see changes in his or her compensation system and, if so, what changes were desired

## METHODOLOGY

This Survey was sponsored and developed by Major, Lindsey & Africa (MLA) in association with ALM Legal Intelligence (ALI), a research arm of ALM Media, the publisher of *The American Lawyer*. ALI allowed respondents to answer confidentially and anonymously, and MLA at no time was made aware of respondents' names or firms, either individually or in the aggregate.

Data for this Survey was collected using an online questionnaire hosted by ALI. Invitations were emailed to 74,299 partners across the United States at firms who have been Am Law 200-, NLJ 350- or Global 100-ranked in the past 5 years[1]. The emailed invitation contained a link which partners could use to access the online survey. To maximize the response rate, three email reminders, spaced about one week apart, were also sent.

The sample was provided by ALI, selected from its proprietary database of practicing lawyers in the U.S. and abroad. The questionnaire was jointly developed by MLA and ALI. As an incentive to complete the Survey, respondents were entered into a drawing to win an American Express gift certificate valued at $1,000.

Responses were received from partners practicing across the United States (2,084) and abroad (144) for a total of 2,228 responses. 781 emails were returned as undeliverable. Assuming that all of the remaining partners contacted received the invitation, the overall response rate was approximately 3.0%.

As is customary with surveys of this nature, not every respondent answered every question. Each data table notes the actual number of respondents for each category. In order for us to present the data meaningfully, in certain cases, individual respondents were grouped into larger categories.

---

[1] Unlike the 2010 Survey, which was sent to partners without regard to firm size, the 2012 Survey was sent only to partners in these large law firms.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




In Questions 11 through 16 of the Survey, respondents were given ranges as response choices. For example, total compensation values were typically grouped in $50,000 ranges (*e.g.*, $800,000 to $850,000). In order to calculate the data for this Report, ALI used, wherever possible, the midpoint for all responses that were expressed as ranges. In those cases where midpoints where not identifiable (*e.g.*, responses where one parameter of the range was open-ended), ALI and MLA jointly agreed on values to be used for those responses.

For profits per equity partner (PPP) data, ALI used the most recent data available. For Am Law firms, ALI used PPP data from the Am Law 200 ranking. For international firms, ALI used the PPP data from the Global 100 ranking. Additionally, in the 2010 Report, PPP figures were self-reported. Therefore, PPP data should be looked at directionally and not as a strict year-over-year comparison, as methodologies for this question are different in 2012.

In order to protect respondents' identities, this Report does not disclose any information about any individual or any individual law firm. All information is reported in the aggregate to ensure anonymity. ALI did not provide the names, email addresses or any other identifying information of individual respondents or any law firm to MLA. At all times, MLA remained blind to the source of the data.

In most cases, this Report compares the results of the 2012 Survey with that of the 2010 Survey. The complete results of the 2010 Survey can be found at the following link.

## Statistical Terms Used

The statistical terms used in the Report are defined below.

- The median (or the 50th percentile) is the middle or central number in a series of numbers arranged in order of value. There are equal numbers of smaller and larger observations.
- The average (or mean) is the total value of all observations divided by the number of observations. While an average can be distorted by "outliers"—data that is aberrant—great care was taken to identify and remove outliers from this Report. Finally, percentages may not total 100 percent because of rounding.

## Compensation, Originations, Receipts, Billing Rates and Hours

Questions 11 through 16 of the Survey dealt with the principal practice metrics of the respondents for the 2011 fiscal year, and address: total compensation, total originations, total working attorney receipts, standard hourly billing rate, total billable hours, and total non-billable hours. These key practice metrics were then sorted by the following categories:

1. Partnership Tenure
2. Partnership Status
3. Practice Area
4. City
5. Compensation Transparency
6. Lockstep Type
7. Firm Size
8. Firm PPP
9. Gender
10. Ethnicity

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

## COMPENSATION

The overarching story in the 2012 Partner Compensation Survey follows the findings of the 2010 Survey, namely: the longer the tenure, the larger the firm, and the bigger the legal market, the higher compensation likely will be[2]. Key findings also include:

- Average compensation for all respondents was $681,000, up 6.4% from 2010 ($640,000). The average billing rate for all respondents was $584, up nearly $30 from 2010 ($555).
- The gap between Equity partners and Non-Equity partners, both in terms of compensation and compensation satisfaction, is growing: Equity partners averaged $896,000 in compensation, versus $335,000 for Non-Equity partners ($811,000 vs. $336,000 in 2010). Equity partners were also three times more likely to classify themselves as Very Satisfied than Non-Equity partners (36% vs. 12%, compared to 28% vs. 15% in 2010), and were also much less likely to classify themselves as Not Very Satisfied (4% vs. 11%, compared to 5% vs. 8% in 2010).
- Partners in Open compensation systems once again reported significantly higher average compensation ($810,000) compared to partners in Closed ($465,000) and Partially Open systems ($515,000), and the gap seems to be widening here as well: In 2010, Open system partners' compensation outpaced Closed system partners by 45%, a difference which has grown to a stunning 74% in 2012. Partners in Open compensation systems were also much more likely to classify themselves as Very Satisfied (34%) than partners in Partially Open (21%) or Closed (13%) compensation systems, compared to 29%, 15% and 16%, respectively, in 2010.
- The disparity in compensation and compensation satisfaction across cities continues to be quite pronounced. Average compensation ranged from a low of $478,000 in Philadelphia to a high of $1.2 million in Silicon Valley. One-third or more of respondents in Seattle, Dallas, San Francisco and Silicon Valley said they were Very Satisfied with their compensation, followed closely by Houston and New York at 32% and Atlanta at 31%. Only 16% of Philadelphia-based partners reported that they were Very Satisfied with their compensation, and Boston had the highest percentage of partners classifying themselves as Not at all Satisfied (13%, up from 6% in 2010).
- Although Litigators again averaged the highest number of billable hours (1,792), they continued to lag significantly in compensation behind Corporate partners ($634,000 vs. $847,000), despite the Corporate partners reporting significantly lower billable hours (1,518). Although Litigators reported lower originations than Corporate partners in 2012 ($1.71 million vs. $2.43 million), they also reported lower compensation in 2010 ($679,000 vs. $759,000) despite having higher originations ($2.36 million vs. $2.21 million) and higher billable hours (1,817 vs. 1,501).
- Male partners continue to significantly outpace females in compensation, and the gap is also widening: $734,000 vs. $497,000 in 2012, compared to $675,000 vs. $513,000 in 2010.
- Cronyism continues to be, by far, the most significant reason for dissatisfaction with compensation satisfaction, outpacing all of the other enumerated reasons combined.
- Originations continue to drive compensation decisions, and its importance is growing: 74% of all respondents noted that Originations were a Very Important factor in determining

[2] It is important to note, however, that these averages to some degree hide the effects of outliers in various segments. For example, while the disparity in average compensation between Open and Closed system partners is quite pronounced, when adjusted for relative originations the differences in compensation are smaller than the averages would suggest. We expect to explore this effect in a follow-up to this Report.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

compensation, 65% of all respondents perceived it to be the most important factor (working attorney receipts was next closest at 21%) and 55% of all respondents cited originations as becoming more important in the compensation process, up significantly from 24% in 2010.

A total of 2,004 respondents provided their compensation data, with reported compensation ranging from less than $100,000 (2 respondents) to over $7.3 million (1 respondent). Average compensation for all respondents was $681,000, a 6.4% increase from 2010 ($640,000).

### *Partnership Tenure and Partnership Status*

Not surprisingly, when sorted by Partnership Tenure, average compensation climbs steadily by tenure grouping, ranging from $399,000 for those in the 1 to 5 year category up to $926,000 for those in the 20+ year category. The 6 to 10 year category showed the largest compensation jump from 2010 (+12%).

***Exhibit 1.1 – Average Total Compensation by Partnership Tenure***

| (in '000) | 1 to 5 years | 6 to 10 years | 11 to 20 years | 20+ years |
|---|---|---|---|---|
| 2012 | $399 | $633 | $790 | $926 |
| 2010 | $399 | $564 | $760 | $908 |

*Average Comp, all respondents: 2012: $681,000*

Similarly, while we expected that Equity partners would continue to significantly outpace Non-Equity partners in compensation, the level of disparity has grown even further since 2010, with Equity partners now averaging about 2.5 times the total compensation of their Non-Equity colleagues. Equity partners reported an 11% jump in compensation, whereas compensation for Non-Equity partners was essentially flat.


***Exhibit 1.2 – Average Total Compensation by Partnership Status***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

*Practice Area*

Among the seven practice areas grouped for the purposes for this Report, Labor & Employment partners reported the lowest average compensation ($506,000), compared to a high of $847,000 for Corporate partners. IP (+19%), Real Estate (+17%) and Corporate (+12%) partners showed the largest percentage increases from 2010, while Litigation partners were the only practice area to show a decline in average compensation (-7%).

***Exhibit 1.3 – Average Total Compensation by Practice Area***

(in '000)

| | 2012 | 2010 |
|---|---|---|
| Corporate | $847 | $759 |
| IP | $715 | $601 |
| Tax & ERISA | $662 | $641 |
| Litigation | $634 | $679 |
| Real Estate | $590 | $506 |
| Labor & Employment | $506 | $470 |
| Other | $668 | $616 |

*Average Comp, all respondents:*

*2012: $681,000*

*City*

The disparity in compensation continues to be quite pronounced when sorted by city. Average compensation ranged from a low of $478,000 in Philadelphia to a high of $1.2 million in the Silicon Valley area of California, a difference of more than 150%. Compensation rose in virtually every city compared to 2010, with Atlanta (+48%), Seattle (+45%), Dallas (+28%) and Boston (+25%) showing the largest gains, and only Los Angeles (-8%) and Philadelphia (-10%) showing a decline. In descending order, average compensation for the twelve cities[3] highlighted in this Report is as follows:

[3] These twelve cities were chosen for their total response counts. Each of the twelve had 50 or more responses, with the exception of Seattle (34) and Dallas (36), which were included for purposes of trending with the 2010 Report. Silicon Valley was not broken out separately in the 2010 Report.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




*Exhibit 1.4 – Average Total Compensation by City*




## *Compensation Transparency and Lockstep Type*

Once again, partners in Open compensation systems reported <u>significantly</u> higher average compensation ($810,000; +13%) compared to partners in Closed ($465,000; -6%) and Partially Open systems ($515,000; unchanged), and the gap seems to be widening. In 2010, Open system partners outpaced Closed system partners by 45%, a difference which has grown to a stunning 74% in 2012.

When sorted by Lockstep Type, Pure Lockstep partners reported average compensation of $1,219,000 (+61%)[4] compared to average compensation of $694,000 (+6%) for Non-Lockstep partners. Partners who classified their compensation system as Generally Lockstep reported significantly lower compensation than both categories, with an average compensation of $563,000 (+5%).

***Exhibit 1.5 – Average Total Compensation by Compensation Transparency***




[4] Because the population size for the "Pure Lockstep" category (33 responses) is much lower than for the other categories, which had 1,671 (Non-Lockstep) and 312 (Generally Lockstep) responses, respectively, it is difficult to draw meaningful conclusions for this category due to potential greater variance in the reported data.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

***Exhibit 1.6 – Average Total Compensation by Lockstep Type***




## *Firm Size and Firm PPP*

When sorted by both Firm Size and Firm PPP, generally speaking, the larger the firm or PPP, the higher the average compensation. Although average compensation for all partners as a group rose 6.4% ($681,000 vs. $640,000), the growth was somewhat uneven, with average compensation at firms of 51-200 lawyers and firms of 501-1,000 lawyers rising 9% and 4%, respectively, while average compensation at firms of 201-500 lawyers and firms of 1,000+ lawyers falling 6% and 4%, respectively.

***Exhibit 1.7 – Average Total Compensation by Firm Size***




Similarly, although average compensation among all partners as a group was up 6.4%, when sorted by Firm PPP virtually every category showed a decline in average compensation, with the exception of the $250-500,000 and $2 million+ categories (up 25% and 13%, respectively). We attribute this somewhat anomalous finding to the fact that in 2010 partners self-reported their firm's PPP, likely with error, whereas in 2012 ALI was able to provide the appropriate PPP for each respondent.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved






***Exhibit 1.8 – Average Total Compensation by Firm PPP***




## *Gender and Ethnicity*

As in 2010, when sorted by gender, male partners' average compensation significantly outpaced females', and the gap here, too, seems to be widening. Average compensation for male partners was approximately 30% higher than for female partners, $734,000 (+9%) vs. $497,000 (-3%).

The average compensation of White partners was $682,000, up 5% from 2010. Asian-Pacific and Hispanic partners reported significantly higher average compensation ($712,000; +39% and $655,000; +28%, respectively), whereas Black partners' average compensation declined 11% ($550,000 in 2010 vs. $489,000 in 2012). Partners who categorized themselves as Mixed Races showed an increase of 24%, from $542,000 to $670,000.[5]

## *Changes in Compensation for Lateral Partners*

Questions 7 through 9 of the Survey were directed at lateral partners, and asked whether their compensation changed as a result of the lateral move and, if so, by what percent. A total of 930 respondents answered this question. Approximately 62% of respondents reported that their compensation increased as a result of the lateral move, compared to 57% in 2010. Approximately 9% saw it decrease (level with 2010), and approximately 29% said their compensation stayed basically the same (compared to 34% in 2010).

*For the complete results, please refer to Appendix II – Average Total Compensation, and Appendix III – Compensation Change for Lateral Partners*

[5] The ethnic categories used in the Survey and this Report track those previously used by the American Bar Association. The number of respondents by ethnic category was as follows: White, not Hispanic (1,789), Black, not Hispanic (34), Hispanic (34), Asian Pacific, not Hispanic (75), American Indian, not Hispanic (5), Native Hawaiian or Pacific Islander, not Hispanic (0), Mixed Races (20). Because of the relatively small number of non-White respondents, it is difficult to draw statistically meaningful conclusions for those categories.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




## ORIGINATIONS

A total of 1,959 respondents provided their originations data, with reported originations ranging from less than $100,000 (213 respondents) to over $30 million (2 respondents). Average originations for all respondents came in at $1,893,000, up 3% from 2010 ($1,838,000).

### *Partnership Tenure and Partnership Status*

As in 2010, originations data showed the same trends for Partnership Tenure and Partnership Status as compensation data. When sorted by tenure, average originations climbed steadily by tenure grouping, ranging from $984,000 (+20%) for those in the 1 to 5 year category to $2.66 million (-11%) for those in the 21+ year category.

***Exhibit 2.1 – Average Originations by Partnership Tenure***

| | 2012 | 2010 |
|---|---|---|
| 1 to 5 years | $984,000 | $819,000 |
| 6 to 10 years | $1,660,000 | $1,578,000 |
| 11 to 20 years | $2,320,000 | $2,252,000 |
| More than 20 years | $2,660,000 | $2,978,000 |

*Average Orig, all respondents: 2012: $1.89M*

Equity partners reported average originations of $2.62 million (+5%), once again coming in at more than three times the average reported by Non-Equity partners ($712,000; +1%).

***Exhibit 2.2 – Average Originations by Partnership Status***






EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




### *Practice Area*

Average originations by Practice Area generally tracked with compensation trends. At the high end, Corporate partners reported average originations of $2.43 million (+10%), and on the low end, Tax/ERISA partners reported $929,000 in originations (-12%). Real Estate ($1.72 million; +56%) and IP ($2.13 million; +44%) partners reported the most significant gains from 2010, while Litigation partners showed the biggest drop ($1.71 million; -28%).

***Exhibit 2.3 – Average Originations by Practice Area***

(in '000)

| | Corp | IP | Real Estate | Litigation | Labor/ Empl | Tax & ERISA | Other |
|---|---|---|---|---|---|---|---|
| 2012 | $2,430 | $2,130 | $1,720 | $1,710 | $1,370 | $929 | $1,962 |
| 2010 | $2,205 | $1,482 | $1,105 | $2,361 | $1,232 | $1,054 | $1,800 |

*Average Orig, all respondents:*

*2012: $1.89M*

### *City*

Origination trends by City also tended to follow compensation trends. Average originations ranged from a low of $1.18 million in Philadelphia (-11% from 2010) to a high of $3.72 million in Silicon Valley (not broken out separately in 2010). As we saw with total compensation, cities with the highest jumps in total originations were Atlanta (+94%), Boston (+31%), Seattle (+54%) and Dallas (+26%). Los Angeles showed the largest decrease in originations, falling 32%, from $2.06 million in 2010 to $1.4 million in 2012.

***Exhibit 2.4 – Average Originations by City***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

### *Compensation Transparency and Lockstep Type*

Partners in Open compensation systems ($2.36 million; +11%) reported average originations more than twice as high as partners in Closed compensation systems ($1.06 million; -24%), and 71% higher than partners in Partially Open systems ($1.38 million; +5%), which is consistent with the wide disparity in compensation among these groups.

***Exhibit 2.5 – Average Originations by Compensation Transparency***

| (in '000) | Open | Partially Open | Closed |
|---|---|---|---|
| 2012 | $2,360 | $1,380 | $1,060 |
| 2010 | $2,121 | $1,309 | $1,389 |

*Average Orig, all respondents:*

*2012: $1.89M*

When sorted by Lockstep Type, Pure Lockstep partners showed significantly higher originations ($3.3 million; +77%) than Non-Lockstep partners ($1.94 million; -1%), perhaps owing to the larger number of Pure Lockstep participants (presumably from firms with higher average PPP) in 2012 compared to 2010. Generally Lockstep partners again reported significantly lower numbers than either category, with average originations of $1.56 million, although this reflected a 30% increase over 2010 numbers for this category.

### *Firm Size and Firm PPP*

When sorted by both Firm Size and Firm PPP, much like we see for compensation, the larger the firm/PPP, the higher the average originations. Originations at firms with greater than 1,000 lawyers were highest, at $2.48 million, although that number is down about 19% from 2010 ($3.05 million). The biggest jump in originations was in the 51-200 firm size category, increasing from $840,000 in 2010 to $1.03 million in 2012 (+23%).

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved






***Exhibit 2.6 – Average Originations by Firm Size***




## *Gender and Ethnicity*

Male partners reported averaged originations of $2.03 million, which is about 50% higher than originations reported by female partners ($1.41 million) and which is generally consistent with the 2010 findings. Originations for females rose about 6% from 2010, whereas originations for males stayed relatively flat (+1.6%).

White partners averaged $1.88 million in originations, behind Asian-Pacific partners and those who classified themselves as Mixed Races ($2.24 million for each group). While originations for White partners were essentially flat, originations for these two other categories rose 77% and 93% respectively. Black partners reported average originations of $1.48 million, up 6% from 2010, and Hispanic partners were the only ethnic group to show a decline, falling from $1.55 million in 2010 to $1.45 million in 2012 (-7%).

*For the complete results, please refer to Appendix IV – Average Total Originations*

## Working Attorney Receipts

A total of 1,915 respondents provided their working attorney receipts (WAR) data, with reported WAR ranging from less than $100,000 (25 respondents) to over $5 million (35 respondents). Average WAR for all respondents was $1,070,000, down 4% from 2010 ($1,113,000).

WAR trends for tenure, status, practice area, city, firm size and firm PPP generally followed the same general patterns as compensation and originations. Notably, Equity partners showed a 6% decrease in WAR ($1.23 million in 2012 vs. $1.31 million in 2010) versus Non-Equity partners, who showed an 8% increase ($834,000 in 2012 vs. $771,000 in 2010).

Although partners in Open compensation systems reported dramatically higher average compensation as compared to partners in Closed and Partially Open systems, the differences among the three groups' WAR was much smaller, at $1.14 million, $960,000 and $1.03 million, respectively. Pure Lockstep

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved 




partners reported average WAR of $2.23 million (+23%), or twice that of both Non-Lockstep and Generally Lockstep partners, which were essentially flat ($1.05 million and $1.11 million, respectively).

Interestingly, although there is large disparity in compensation and originations based on gender, average WAR for male and female partners were much more in line, at $1.12 million and $906,000 respectively. However, average WAR for female partners dipped approximately 15% from 2010 levels, whereas average WAR for male partners remained essentially static.

*For the complete results, please refer to Appendix V – Average Total Working Attorney Receipts*

## Billing Rates, Billable Hours and Non-Billable Hours

2,002 respondents provided their hourly billing rate data. Hourly billing rates ranged from $115 (1 respondent) to $1,265 (1 respondent). The average billing rate for all respondents was $584, up nearly $30 from 2010 ($555). In most cases, billing rate trends generally followed compensation, originations and WAR trends.

1,971 and 1,990 respondents provided billable and non-billable hour data, respectively. Reported billable hours ranged from 500 hours or below (105 respondents) to 3,000 hours or more (13 respondents). Reported non-billable hours ranged from 75 hours or below (59 respondents) to 1,000 hours or more (282 respondents). The average billable hours for all respondents was 1,687 hours, up from 1,657 hours in 2010, and non-billed time averaged 530 hours, down from 563 in 2010. Interestingly, non-billed time decreased by nearly the exact same amount that billed time increased, such that the total numbers of hours worked remained essentially flat from 2010 to 2012 (2,220 hours in 2010 vs. 2,217 hours in 2012).

Generally speaking, the larger the firm, the higher the billing rate, and the higher the number of billable and non-billable hours. This relationship was also generally true when sorted by Firm PPP, although there was much greater variance when sorted in this fashion. Notably, partners at firms with PPP in excess of $2 million reported significantly lower non-billable hours than partners at firms with PPP between $1 million and $2 million, though the billable hours of the $2 million+ partners were much higher as well.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




***Exhibit 3.1 – Average Billing Rate by Firm Size***




***Exhibit 3.2 – Average Billable Hours by Firm Size***




***Exhibit 3.3 – Average Non-Billable Hours by Firm Size***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




Below are highlights of selected billing rates, billable hours and non-billable hours data.

*Billing Rates*

- Corporate and Real Estate partners showed the highest percentage gains in billing rates, climbing to $671 (+9%) and $565 (+8%), respectively, whereas Labor & Employment partners continued to report the lowest hourly billing rate at $473, up from $462 in 2010. Litigators showed the only decrease in billing rates, falling from $541 to $537.
- Virtually every city reported an increase in billing rates, with the exception of Los Angeles and Philadelphia, which both showed nominal decreases.
- Pure Lockstep partners reported significantly higher billing rates in 2012, up 34% from 2010 ($814 vs. $607), whereas Non-Lockstep and Generally Lockstep partners showed much more modest increases of +5% and +2%, respectively.
- Average billing rates for male partners rose 6%, climbing from $564 in 2010 to $598 in 2012. Female partner billing rates rose only 2%, rising to $533 from $523.

*Billable Hours*

- Although Non-Equity partners still averaged fewer billable hours than Equity partners, the spread narrowed considerably in 2012, from a 65-hour differential in 2010 (1,683 hours vs. 1,618 hours) to a 38-hour differential in 2012 (1,701 hours vs. 1,663 hours).
- Real Estate partners showed the largest gain in billable hours by far, up from 1,434 hours in 2010 to 1,593 in 2012 (+11%). Both Litigators and Labor & Employment partners showed lower billable hours, falling from 1,817 and 1,675, respectively, in 2010 to 1,792 and 1,660, respectively, in 2012 (-1% for each). Moreover, although Litigators again averaged the highest number of billable hours (1,792), they continued to lag significantly in compensation behind Corporate partners ($634,000 vs. $847,000), despite the Corporate partners reporting significantly lower billable hours (1,518).
- Partners in Open and Partially Open compensation systems showed very modest increases in billable hours, rising 1% and 0.5%, respectively, whereas the billable hours of partners in Closed systems rose 4%, despite their average compensation falling 6%.
- Male and female partners billed nearly the same number of hours in 2012 (1,690 vs. 1,670, respectively), narrowing the gap even further from 2010 (1,666 vs. 1,622, respectively).

*Non-billable Hours*

- Partners in the 6 to 10 year category were the only tenure grouping to show an increase in non-billable hours, rising from 500 in 2010 to 531 in 2012. All other tenure groupings reported lower non-billable hours, with the largest drop reported by the 20+ year category (from 694 to 587; -15%).
- Open compensation system partners again significantly outpaced Closed compensation system partners in non-billable hours, reporting 571 non-billable hours versus 435 hours (down from 587 and 487, respectively, in 2010).
- Non-billable hours of Pure Lockstep partners rose significantly in 2012, up from 455 to 589 (+30%).

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

- Generally speaking, the larger the Firm Size, the greater the drop-off in non-billable hours in 2012.
- Non-billable hours of female partners dropped 11%, from 548 in 2010 to 490 in 2012, versus a 5% drop by male partners, from 567 to 541.

*For the complete results, please refer to Appendix VI – Average Billing Rates, Appendix VII – Average Billable Hours, and Appendix VIII – Average Non-Billable Hours.*

## COMPENSATION SATISFACTION, FACTORS AND SYSTEMS

Questions 18 through 29 of the Survey dealt with compensation satisfaction and the respondents' perceptions of their compensation and compensation systems. Satisfaction data was then sorted by the following categories:

1. Partnership Tenure
2. Partnership Status
3. Practice Area
4. City
5. Lateral Status
6. Move-Related Compensation Change
7. Compensation Transparency
8. Lockstep Type
9. Total Compensation
10. Total Originations
11. Total Billable Hours
12. Firm Size
13. Firm PPP
14. Gender
15. Ethnicity

### SATISFACTION RATINGS

Question 24 addressed compensation satisfaction. A total of 2,009 respondents answered this question. 27% classified themselves as Very Satisfied, 51% classified themselves as Somewhat Satisfied, 15% said they were Not Very Satisfied, and 7% were Not at all Satisfied. These satisfaction levels are almost exactly the same as we saw in the 2010 Survey.

***Exhibit 4.1 – Overall Satisfaction with Total Compensation***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

*Partnership Tenure and Partnership Status*

The two most senior groupings of lawyers once again were more likely to classify themselves as Very Satisfied with their compensation (31% and 33% for categories 11 to 20 years and 20+ years, respectively, versus 18% and 25% for categories 1 to 5 years and 6 to 10 years, respectively). Moreover, the chasm between Equity partners' and Non-Equity partners' compensation satisfaction seems to be growing. Equity partners were three times more likely to classify themselves as Very Satisfied than Non-Equity partners (36% vs. 12%, as compared to 28% vs. 15% in 2010), and were also much less likely to classify themselves as Not At All Satisfied (4% vs. 11%, as compared to 5% vs. 8% in 2010).

***Exhibit 4.2 – Satisfaction by Partnership Tenure***




***Exhibit 4.3 – Satisfaction by Partnership Status***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC, All rights reserved




LEGAL SEARCH CONSULTANTS

### *Practice Area*

Sorting the data by Practice Area, Tax/ERISA partners were most likely to classify themselves as Very Satisfied (31%), up strongly from 2010 (20%), whereas Real Estate partners were least likely (20%), down slightly from 2010 (23%). Labor & Employment partners were the next highest group to show strong gains, with 23% classifying themselves as Very Satisfied in 2012 versus 15% in 2010. The practice area with the largest number of partners classifying themselves as Not at all Satisfied was IP, at 9%, followed closely by Real Estate at 8%, and the practice areas with the largest number of partners classifying themselves as either Not at all Satisfied or Not Very Satisfied were Litigation, at 24%, followed by Real Estate at 23% and Corporate and IP both at 22%, whereas Labor & Employment partners had the lowest percentage, at 17%.

***Exhibit 4.4 – Satisfaction by Practice Area***




### *City*

Cities with high satisfaction (33% or more Very Satisfied) include Seattle, Dallas, San Francisco and Silicon Valley, followed closely by Houston and New York at 32% and Atlanta at 31%. At the other end of the spectrum, only 16% of Philadelphia-based partners reported that they are Very Satisfied with their compensation, a figure that has dropped approximately 12 percentage points from 2010. Boston had the highest percentage of partners classifying themselves as Not at all Satisfied (13%, up from 6% in 2010), and the following cities had 25% or more of their partners classifying themselves as either Not at all Satisfied or Not Very Satisfied: Philadelphia and Los Angeles (28%), San Francisco (27%), Boston

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved 




LEGAL SEARCH CONSULTANTS

(26%), and New York (25%). Texas seems to be the place to be, as only 8% and 9% of partners in Houston and Dallas, respectively, classified themselves as either Not at all Satisfied or Not Very Satisfied.

***Exhibit 4.5a – Satisfaction by City (1)***




***Exhibit 4.5b – Satisfaction by City (2)***




## *Compensation Transparency and Lockstep Type*

Partners in Open compensation systems were much more likely to classify themselves as Very Satisfied (34%) than partners in Partially Open (21%) or Closed (13%) compensation systems, and the gap seems to be growing: In 2010, 29% of partners in Open systems classified themselves as Very Satisfied compared to 16% in Closed systems. Partners in Pure Lockstep systems showed large gains in

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved






compensation satisfaction, with 55% of Pure Lockstep partners classifying themselves as Very Satisfied (compared to 23% in 2010).

***Exhibit 4.6 – Satisfaction by Compensation Transparency***

| | Open (2012) | Open (2010) | Partially Open (2012) | Partially Open (2010) | Closed (2012) | Closed (2010) |
|---|---|---|---|---|---|---|
| Very Satisfied | 34% | 29% | 21% | 15% | 13% | 16% |
| Somewhat Satisfied | 49% | 50% | 55% | 53% | 53% | 52% |
| Not Very Satisfied | 12% | 16% | 17% | 14% | 22% | 21% |
| Not At All Satisfied | 5% | 4% | 6% | 5% | 11% | 9% |



***Exhibit 4.7 – Satisfaction by Lockstep Type***




## *Total Compensation, Total Originations, Billable Hours*

Not surprisingly, compensation satisfaction climbs in relation to total compensation and originations. Once again, in 2012 we saw significantly higher levels of compensation satisfaction in the higher compensation ranges. Notably, the percentage of partners in the $1 million to $1.5 million grouping and the $1.5 million+ grouping classifying themselves as Very Satisfied jumped from 35% and 56%, respectively, to 54% and 65%, respectively. These same, huge jumps were also evident in the highest bands when the data was sorted by originations. When sorted by billable hours, the spread between groupings is far narrower, although it is interesting that partners in the higher billable hour groupings tend to have slightly higher levels of compensation satisfaction.

***Exhibit 4.8 – Satisfaction by Total Compensation***

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved









***Exhibit 4.9 – Satisfaction by Total Originations***




***Exhibit 4.10 – Satisfaction by Billable Hours***




*Firm Size and Firm PPP*

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

Although Firm Size seems to have no significant bearing on compensation satisfaction, partners at firms with higher PPP generally were more likely to classify themselves as Very Satisfied and less likely to say they were Not Very Satisfied or Not at all Satisfied, which generally is consistent with the 2010 results.

***Exhibit 4.11– Satisfaction by Firm PPP***

**2012**

| | Very Satisfied | Somewhat Satisfied | Not Very Satisfied | Not At All Satisfied |
|---|---|---|---|---|
| $0.25M - $0.5M | 22% | 57% | 16% | 6% |
| $0.5M - $0.75M | 19% | 52% | 21% | 7% |
| $0.75M - $1M | 25% | 54% | 14% | 7% |
| $1M - $1.25M | 23% | 55% | 14% | 8% |
| $1.25M - $1.5M | 36% | 49% | 10% | 4% |
| $1.5M - $1.75M | 31% | 45% | 13% | 10% |
| $1.75M - $2M | 39% | 45% | 9% | 7% |
| $2M + | 51% | 40% | 6% | 2% |




## *Gender and Ethnicity*

In 2010, an equal percentage (24%) of males and females reported that they were Very Satisfied with their compensation. The 2012 results now show a slight gap, with 28% of males reporting they are Very Satisfied compared to 22% of females. At the opposite end, in 2010, 16% of males and 19% of females reported that they were Not at all Satisfied with their compensation, both of which have fallen considerably, to 6% and 9%, respectively, in 2012. Overall, however, the changes seem less dramatic: 80% of males classified themselves as Very Satisfied or Somewhat Satisfied in 2012, compared to 78% in 2010, and 72% of females classified themselves as such in 2012, compared to 71% in 2010.

***Exhibit 4.12 – Satisfaction by Gender***

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved







Once again, White and Black partners had very similar percentages of Very Satisfied partners (27% and 24%, respectively, compared to 25% and 24% in 2010), although 18% of Black partners classified themselves as Not at all Satisfied, up from 12% in 2010, compared to only 6% (unchanged) for White partners. A much greater percentage of Hispanic partners classified themselves as Very Satisfied in 2012, rising from 17% in 2010 to 27% in 2012, and only 15% of Hispanic partners classified themselves as either Not at all Satisfied or Not Very Satisfied in 2012, down from 20% in 2010. Asian Pacific partners and partners classifying themselves as Mixed Races once again had lower percentages of Very Satisfied partners, coming in at 19% and 15%, respectively, versus 16% and 14%, respectively, in 2010. 40% of partners classifying themselves as Mixed Races and American Indian said they were Not at all Satisfied or Not Very Satisfied with their compensation, which was far higher than the other ethnic groupings.[6]

## Compensation Satisfaction and Perceived Bias

Respondents who answered Not Very Satisfied or Not at all Satisfied to Question 24 were then asked if their lack of satisfaction was attributable to any biases on the part of their firms, such as cronyism, gender bias, racial bias, sexual orientation bias and bias against laterals. A total of 367 respondents answered this question.

More than one-third (35%) of the respondents attributed their lack of compensation satisfaction to cronyism, with that factor once again (40% in 2010) outpacing all of the other enumerated reasons combined (although 29% percent answered Not Sure and 21% answered Other Reason). 11% of respondents cited gender bias (up from 5% in 2010), followed by sexual orientation bias (2%, down from 3% in 2010), bias against laterals (1%, down from 7% in 2010), and racial bias (1%, down from 2% in 2010).

*For the complete results, please refer to Appendix IX – Satisfaction with Total Compensation.*

[6] Again, it is difficult to draw meaningful conclusions for the non-White categories because of the relatively small number of respondents.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




## DESIRE FOR HIGHER COMPENSATION

Questions 26 and 27 of the Survey asked respondents whether they thought their total compensation should be higher than it is and, if so, by what percentage. A total of 1,995 respondents answered the question, with 58% answering that they believed it should be higher (61% in 2010) and 43% answering that they felt their current compensation was about right (39% percent in 2010). Of those who felt that their compensation should be higher, 10% believed their compensation should be between 0-10% higher, 47% believed it should be between 11-20% higher, 27% believed it should be between 21-30% higher, 7% believed it should be between 31-40% higher and 4% believed it should be between 41-50% higher. The remaining 5% of respondents believed their compensation should be between 51% to greater than 100% higher. These numbers are *virtually identical* to the 2010 results.

***Exhibit 5.1 – Satisfaction with Compensation Level***




***Exhibit 5.2 – Level of Compensation Desired (Percentage Increase)***




*For the complete results, please refer to Appendix X – Desired Compensation*

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




## IMPORTANCE OF FACTORS IN DETERMINING COMPENSATION

Questions 18 through 23 of the Survey sought subjective information from respondents about their perception of factors they felt were important to their firms in determining compensation. Questions 28 and 29 asked respondents whether they'd like to see a change in compensation methods and, if so, what changes they would like to see.

### PERCEIVED IMPORTANCE OF FACTORS

In Question 18, respondents ranked the importance of nine factors as Very Important, Somewhat Important, Not Very Important or Not Important at All in determining compensation (responses for each individual importance rating can be found in Appendix XI). Approximately 1,961 respondents answered this question. Of the nine enumerated factors, originations had the highest percentage (74%) of Very Important ratings, followed by WAR (59%) and billable hours (40%). The next highest factor was realization rate at only 26%. Not surprisingly, non-billable hours once again received the lowest number of Very Important ratings, at just 1%. This is the same general pattern of responses we saw in the 2010 Survey. However, while the originations and WAR numbers remained fairly constant (76% and 58%, respectively, in 2010 vs. 74% and 59%, respectively, in 2012), the percentages for billable hours and realization rate both fell sharply (57% and 32%, respectively, in 2010 vs. 40% and 26%, respectively, in 2012).

***Exhibit 6.1 – Importance of Factors Determining Compensation***




EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved






In Questions 19 and 20, respondents were asked what factor was perceived by them to be most important in determining compensation, and what factor did they believe should be most important. Originations was the most frequently chosen of the listed response options, with 65% perceiving it to be most important and 58% saying it should be most important. WAR was the second most cited, at 21% and 25%, respectively. No other factor received more than 8%. These responses are virtually identical to the percentage breakdown we saw in the 2010 Survey.

***Exhibit 6.2 – Perceived Importance of Factors Determining Compensation***




## *Perceived Change in Importance of Factors*

In Question 21, respondents were asked whether there has been a change in the importance of various factors in determining compensation. Of the 1,951 respondents to this question, 44% believed that there had been a change, 37% felt that there had not been a change, and 19% were not certain. These results are generally consistent with the 2010 Survey (41%, 41% and 18%, respectively).

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved








***Exhibit 6.3 – Change in Importance of Factors Determining Compensation***




When asked in Question 22 to name those factors which respondents believed had become more important, 55% of the 854 respondents cited originations, up significantly from 24% in 2010. WAR, billable hours and realization rate also all increased dramatically, climbing to 32%, 31% and 27%, respectively, up from 14%, 21% and 7%, respectively, in 2010. The results should also give senior partners more reasons for concern, as 52% of all respondents said seniority was becoming less important, up from 32% in 2010. And, in a telling blow for law firm culture, 45% and 36% of respondents, respectively, cited good citizenship and non-billable hours as factors that were also becoming less important, up from 11% and 7%, respectively, in 2010.

## *Desire for Change in Compensation Methods*

Questions 28 and 29 asked respondents whether they'd like to see a change in compensation methods and, if so, what changes they'd like to see. Of the 2,002 respondents to Question 28, 67% said they would like to see a change in compensation methods, 20% did not desire any changes and the remainder were not sure. These results generally track the 2010 Survey. Of the 1,332 respondents who were in favor of change, suggestions once again included:

- increased transparency
- more recognition for good citizenship and team work
- more appreciation for cross-selling
- less emphasis on originations
- less emphasis on billable hours/working attorney receipts
- less value placed on firm management
- more emphasis on seniority
- more consideration for non-billable hours
- reducing compensation of non-performing lawyers faster
- less cronyism

*For the complete results, please refer to Appendix XI – Importance of Factors Determining Compensation; Desire for Changes.*

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved




LEGAL SEARCH CONSULTANTS

## RESPONDENT PROFILE

### PARTNERSHIP TENURE

2,063 respondents answered this question. For purposes of this Report, respondents typically have been grouped into four major categories: 1 to 5 years, 6 to 10 years, 11 to 20 years and 20+ years:

***Exhibit 7.1 – Respondents by Partnership Tenure***




### PARTNERSHIP STATUS

2,061 respondents answered this question. 62% (1,275) of the respondents classified themselves as Equity partners and 38% (786) classified themselves as Non-Equity partners. The definitions for Equity and Non-Equity partner tracked the definitions used by *The American Lawyer* in its annual survey of law firms. (See Appendix XII: Questionnaire).

### PRACTICE AREA

2,063 respondents answered this question. While the Survey offered over 25 practice area choices, for purposes of this Report respondents were grouped into seven categories.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved






*Exhibit 7.2 – Respondents by Practice Area*




CITY

2,058 respondents answered this question, representing more than 60 cities across the United States, as well as overseas branch offices. For purposes of this Report, we have included data for the ten cities with 50 or more respondents, plus the two cities which were broken out in the 2010 Survey that did not have 50 or more respondents this year (Seattle and Dallas). Silicon Valley was not broken out separately in the 2010 Survey. These 12 cities represent almost two-thirds (62%) of total responses.

*Exhibit 7.3 – Respondents by City*




LATERAL STATUS

2,061 respondents answered this question. 45% (930) of the respondents indicated that they had come to their present firm as a lateral partner, and 55% (1,131) of the respondents indicated that they were previously associates or counsel at their present firms before being promoted to partner. This latter group is sometimes referred to in this Report as "home grown" partners.

EXHIBIT 1

Copyright © 2012 Major, Lindsey & Africa, LLC. All rights reserved